Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VIII

| PR RECOVERY AND DEVELOPMENT JV, LLC<br><br>Apelado<br><br>V.<br><br>ZYMBIA COMPANY, CORP.; SIMBIA WALESKA DÍAZ CHICO<br><br>Apelantes | TA2026AP00397 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.: SJ2023CV11233<br><br>Sobre: Cobro de Dinero, Ejecución de Hipoteca y Ejecución de Gravamen Mobiliario |
|---|---|---|

Panel integrado por su presidenta; la Juez Lebrón Nieves, el Juez Pagán Ocasio y la Jueza Álvarez Esnard

*Lebrón Nieves, Juez Ponente*

## SENTENCIA

En San Juan, Puerto Rico, a 22 de junio de 2026.

El 15 de abril de 2026, compareció ante este Tribunal de Apelaciones, Zymbia Company Corporation (en adelante, Zymbia) y la señora Symbia W. Díaz Chico (en adelante, señora Díaz Chico, y en conjunto, parte apelante), por medio de recurso de *Ceriorari[1]*. Mediante este, nos solicita que revisemos la *Sentencia* emitida el 3 de noviembre de 2025, y notificada el 4 de noviembre de 2025, por el Tribunal de Primera Instancia, Sala Superior de San Juan. En virtud del aludido dictamen, el foro *a quo* declaró HA LUGAR la *Demanda* y la *Moción de Sentencia Sumaria* presentada por PR Recovery and Development JV, LLC (en adelante, PRRD o parte apelada), y NO HA LUGAR la *Solicitud de Paralización de los Procedimientos y Oposición a Sentencia Sumaria* instada por la parte apelante.

---

[1] Acogido como Apelación el 20 de abril de 2026.

Por los fundamentos que adelante se exponen, se *confirma* la *Sentencia* apelada.

**I**

Los hechos que suscitaron la controversia de epígrafe, se remontan al 1ro de diciembre de 2023, cuando la parte apelada presentó *Demanda* sobre cobro de dinero, ejecución de hipoteca y ejecución de gravamen inmobiliario en contra de la parte apelante. En esencia, explicó ser el comprador y sucesor en interés de ciertos activos del Banco de Desarrollo Económico (DBE), incluyendo unas facilidades de crédito a favor de la parte apelante. Según la parte apelada, dichas facilidades de crédito están vencidas, son líquidas y exigibles, y la parte apelante se encontraba en incumplimiento con sus obligaciones respecto a estas.  En cuanto a lo anterior, explicó que, el 1 de noviembre de 2007, el DBE, como acreedor, Zymbia como deudora y la señora Díaz Chico, como garantizadora solidaria, suscribieron una *Carta Compromiso*. De acuerdo a la *Demanda*, el 31 de diciembre de 2007, las partes en igual calidad, otorgaron un *Contrato de Préstamo*, en virtud del cual, se le concedió a Zymbia, un préstamo comercial por la cantidad agregada de $273,740.00 dividido en dos facilidades de crédito, a saber: 1) un préstamo a término por la suma principal de $223,740.00 (préstamo I), y 2) un préstamo a término por la suma principal (préstamo II). La parte apelada sostuvo que, el préstamo I estaba evidenciado por un pagaré emitido el 21 de diciembre de 2007 por Zymbia, como deudora y la señora Díaz Chico como garantizadora solidaria, a favor del DBE o a su orden, debidamente endosado a favor de PRRD, por la suma principal de $$223,740.00, acumulando intereses a una tasa variable del 1% sobre la tasa de interés anual determinada por el Citibank, N.A., con una tasa anual mínima a cobrar del 5.5%, a vencer el 5 de enero de 2038. En cuanto al préstamo II, mencionó que está evidenciado por un pagaré emitido el 21 de diciembre de

2007 por Zymbia, como deudora, y la señora Díaz Chico como garantizadora solidaria, a favor del BDE, o a su orden, debidamente endosado a favor de PRRD, por la cantidad principal de $50,000.00, acumulando intereses a una tasa variable del 0.5% sobre la tasa de interés anual determinada por el Citibank, N.A., con una tasa anual mínima del 4%, a vencer el 5 de enero de 2018. La parte apelada aseguró ser el tenedor físico de los pagarés, los cuales estaban debidamente endosados a su favor.

Por otro lado, en la *Demanda*, PRRD sostuvo que, como colateral para asegurar el pago y cumplimiento puntual de sus obligaciones bajo el *Contrato de Préstamo*, Zymbia, entregó a BDE, en carácter prendario, un pagaré hipotecario, que está en posesión de PRRD, en virtud de un *Contrato de Prenda*. La parte apelada describe el aludido pagaré de la siguiente forma:

> Pagaré hipotecario emitido el 21 de diciembre de 2007, por ZC Corp., a favor del BDE, o a su orden, debidamente endosado a favor de PRRD, por la suma principal de $229,000.00, autenticado bajo el afidávit número 4,584 de la Notario Público Yasmín M. Santiago Zayas (en lo sucesivo, el "Pagaré Hipotecario"). Copia del Pagaré Hipotecario se hace formar parte de esta Demanda como Anejo 6. El Pagaré Hipotecario está garantizado por hipoteca constituida mediante la Escritura Número 42 de Hipoteca en Garantía de Pagaré, otorgada en San Juan, Puerto Rico, el 21 de diciembre de 2007, ante la Notario Público Yasmín M. Santiago Zayas, la cual consta inscrita al folio 1965 del tomo 1129 de Sabana Llana, finca número 10,343, Registro de la Propiedad, Sección V de San Juan (en lo sucesivo, la "Hipoteca").

La parte apelada explicó que, la hipoteca que garantiza el pagaré hipotecario grava la siguiente propiedad, cuyo titular registral es Zymbia:

> **URBANA**: Solar marcado con el número tres (3) del bloque KG (hoy Calle Molucas 841) del Plano de Inscripción de la Cuarta Extensión, primera etapa de la Urbanización Country Club, situada en el Barrio Sabana Llana del municipio de Río Piedras, San Juan, Puerto Rico, con una cabida superficial de trescientos cincuenta (350.00) metros cuadrados, colindando por el NORESTE, en veinticinco (25.00) metros con el solar número cuatro (4); por el SUROESTE, en veinticinco (25.00) metros con el solar número dos (2); por el

SURESTE, en catorce (14.00) metros con el solar número veinticuatro (24); y por el NOROESTE, en catorce (14.00) metros, con la Avenida Iturregui.

Finca número 10,343, inscrita al folio 194 del tomo 518 de Sabana Llana, Registro de la Propiedad de Puerto Rico, Sección V de San Juan (en lo sucesivo, la "Propiedad").

Arguyó que, el gravamen sobre el pagaré hipotecario quedó debidamente perfeccionado al entregarse la posesión de este al acreedor hipotecario, cuyo tenedor, físicamente y por endoso, era PRRD.

Además, añadió que, como colateral, para asegurar el pago y cumplimiento puntual de sus obligaciones bajo el *Contrato de Préstamo*, el 21 de diciembre de 2007, el BDE y Zymbia, suscribieron un *Acuerdo de Gravamen* , mediante el cual este último transfirió, cedió, otorgó y/o pignoró a favor de BDE, todo derecho, título y/o interés sobre todo el equipo y maquinaria, inventario y las cuentas por cobrar, presentes o futuras, y el producto de cualesquiera de ellos, incluyendo sin limitarse al equipo y maquinaria, inventario y las cuentas por cobrar, presentes o futuras, y el producto de cualesquiera de ellos, incluyendo sin limitarse al equipo a ser adquirido por Zymbia. Según la *Demanda*, en la misma fecha, la señora Díaz Chico otorgó una *Garantía Continua e Ilimitada*, donde garantizó solidariamente el pago de todas las obligaciones presentes y futuras de Zymbia.

De acuerdo a lo argumentado por la parte apelada en la *Demanda*, la parte apelante incumplió con las obligaciones de pago bajo el *Contrato de Préstamo*, los pagarés operacionales, el pagaré hipotecario, la hipoteca y otros documentos de préstamo. Sostuvo que, al 29 de noviembre de 2023, la parte apelante le adeudaba, bajo el *Contrato de Préstamo* y el pagaré operacional I, una suma no menor de $266,211.41, desglosada: (i) $187,378.83 por concepto de principal, más (ii) $78,832.58 por concepto de intereses acumulados

y no pagados. Así como, la suma de $22,900.00 por concepto de costas, gastos y honorarios de abogado pactados expresamente por las partes. Aseguró que, al momento de la presentación de la *Demanda*, las obligaciones de pago de la parte apelante se encontraban vencidas, eran líquidas y exigibles. Por lo tanto, le solicitó al foro *a quo* que ordenara el pago de la suma de $289,111.41, más cualquier otra partida acumulada con posterioridad al 29 de noviembre de 2023 y no pagada. De igual forma, solicitó al foro primario que ante la ausencia de pago por parte de los apelantes, ordenara la ejecución de la Hipoteca que garantiza las obligaciones de pago de estos, bajo el pagaré hipotecario y el *Contrato de Préstamo*. Así como, ordenara la ejecución del resto de la colateral constituida en garantía de los documentos de préstamo.

El 6 de marzo de 2024, la parte apelante presentó *Contestación a Demanda*. Por medio de esta, en general, negó las alegaciones de la *Demanda*. Adujo falta de información, conocimiento y creencia. Alegó que, las cantidades adeudadas estaban sujetas a verificación y solicitó el original del pagaré. Asimismo, levantó varias defensas afirmativas, entre estas, que había realizado varias gestiones con la parte apelada, pero que habían sido infructuosa. Además, arguyó que, la parte apelante se encontraba reclamando con las manos sucias, que la *Demanda* no justifica la concesión de un remedio, que la conducta de la parte apelada había imposibilitado la venta de la propiedad, y que esta incumplió con las condiciones previas antes de instar la demanda, entre otras.

Junto a su escrito, la parte apelante incluyó una *Reconvención* en contra de la parte apelada. Según alegó, los hechos alegados en la demanda eran consecuencia de la culpa o negligencia de la parte apelada, quien impidió que la parte apelante llevara a cabo cualquier

transacción con el inmueble hipotecado. Añadió que, la parte apelante no le proveyó opciones para flexibilizar el cumplimiento de sus obligaciones.

La parte apelada, el 16 de abril de 2024, presentó *Moción de Desestimación de la Reconvención*. Mientras que, el 5 de agosto de 2024, la parte apelante presentó escrito intitulado *R[é]plica*.

Transcurridas varias incidencias procesales, innecesarias pormenorizar, el 3 de octubre de 2024, la parte apelante presentó *Moción de Sentencia Sumaria*. Por medio de dicha moción, reiteró la postura plasmada en la *Demanda*, y sostuvo que, no existían hechos materiales en controversia respecto a que las facilidades de crédito se encontraban vencidas, líquidas y exigibles, así como que la parte apelante se encontraba en incumplimiento de sus obligaciones. En su solicitud de sentencia sumaria, la parte apelada propuso 17 hechos que, a su juicio, no se encontraban en controversia, respecto al préstamo hipotecario, la colateral hipoteca, la colateral adicional, la garantía continua e ilimitada y las sumas de dinero adeudadas. Solicitó al foro de primera instancia que dictara sentencia sumaria a su favor.

Así las cosas, mediante *Sentencia Parcial* emitida el 20 de marzo de 2025, el Tribunal de Primera Instancia declaró Ha Lugar la *Moción de Desestimación de Reconvención* presentada por la parte apelante.

El 30 de abril de 2025, la parte apelante presentó *Moción Desestimación*. Argumentó que, la parte apelada no había demostrado ser el tenedor legítimo del instrumento. De igual forma, sostuvo que, el préstamo fue llevado a cabo bajo un programa federal y que no surgía de forma alguna que se hubiese aprobado la venta o cesión de la deuda realizada por el BDE a PRRD. Asimismo, alegó que, la parte apelada no había producido prueba para

establecer que ostenta una reclamación válida en su contra. Por lo anterior, solicitó la desestimación de la *Demanda.*

En igual fecha, el foro de primera instancia emitió una *Orden* en la cual le concedió a la parte apelante 20 días para presentar su postura en cuanto a la solicitud de sentencia sumaria.

Más adelante, la parte apelante presentó *Moción de Prórroga* donde solicitó una prórroga de cinco días para presentar su oposición a la *Moción de Sentencia Sumaria.* Mediante *Orden* emitida el 16 de mayo de 2025, el foro *a quo* declaró Ha Lugar la aludida solicitud de prórroga.

El 30 de mayo de 2025, PRRD presentó *Moción para que la Solicitud de Sentencia Sumaria (SUMAC Núm. 44) se Tenga por Sometida sin Oposición y Lista para Adjudicación.* Argumentó que, la parte apelante no había presentado la oposición a la *Moción de Sentencia Sumaria* dentro del término disponible para hacerlo. Por lo anterior, solicitó al foro *a quo* que se tuviera por sometida la *Moción de Sentencia Sumaria* y acogiera los hechos allí esbozados como no controvertidos.

Por otro lado, en la misma fecha la parte apelante presentó *Solicitud de Paralización de los Procedimientos y Oposici[ó]n a Sentencia Sumaria.* Informó que se estaría acogiendo a la reglamentación federal de la CFPB, sec. 1024.41(f), la cual paraliza los procedimientos y no permite la presentación de moción dispositiva alguna. En la alternativa, solicitó que la parte apelada presentara el original del pagaré hipotecario. Reiteró que, la parte apelada no había demostrado ser el tenedor legítimo del instrumento, y que no surgía de la *Demanda* la aprobación de la venta o cesión de la deuda por parte de la Administración de Desarrollo de Estados Unidos. Señaló, además, que la parte apelada no había producido prueba para establecer que tiene una reclamación válida. Según la parte apelante, existían hechos en

controversias y por tanto, no procedía que se dictara sentencia sumaria a favor de la parte recurrida. Por lo anterior, solicitó al foro primario la paralización de los procedimientos.

Mediante *Orden* emitida el 2 de junio de 2025, el foro apelado concedió un término de cinco días a la parte apelante para acreditar la presentación de solicitud bajo reglamentación federal que justificaría proceder con la paralización.

Posteriormente, la parte apelada presentó *Moción Informando Intención de Replicar a "Solicitud de Paralización de los Procedimientos y Oposición a Sentencia Sumaria (SUMAC Núm. 52)"*.

El 12 de junio de 2025, la parte apelante presentó *Escrito al Expediente Judicial*. Por medio de este alegó que, le solicitaron a la parte apelada la solicitud de *Loss Mitigation*, pero que las gestiones habían sido infructuosas. Solicitó el término de cinco días laborables adicionales para instar la paralización del caso. Mediante *Orden* emitida el 13 de junio de 2025, el foro *a quo* le concedió lo solicitado.

Por su parte, PRRD presentó *Moción para que se tome por no Puesto Argumento de Paralización (SUMAC Núm. 52)*. La parte apelada arguyó que, transcurrió el término concedido por el foro primario sin que la parte apelante compareciera según ordenado. Por lo que, solicitó que tomara por no puesta la solicitud de la parte apelante en cuanto a la paralización de los procedimientos.

La parte apelante presentó el 25 de junio de 2025, *Escrito al Expediente Judicial* donde solicitó al foro de primera instancia ordenar a la parte apelada proveer la solicitud de *loss mitigation*.

En respuesta, la parte apelada presentó *Moción sobre Escrito al Expediente Judicial (SUMAC NÚM. 59)*. De acuerdo con dicha moción, la parte apelante no le había requerido a PRRD solicitud de *loss mitigation* alguna. Indicó que, la propiedad objeto de la ejecución del caso de marras es una de carácter comercial, la cual no constituye la residencia principal de la parte apelante y por tanto,

no le aplica el procedimiento de *loss mitigation*. Solicitó al foro apelado declarar No Ha Lugar la moción presentada por la parte apelante.

El 27 de junio de 2025, el Tribunal de Primera Instancia emitió *Orden* donde dispuso lo siguiente:

> ENTERADO. LA INAPLICABLIDAD DE LA MITIGACIÓN DE PÉRDIDA EN CASOS COMERCIALES NO IMPIDE QUE EL ACREEDOR PUEDA OFRECER OTRAS ALTERNATIVAS AL DEUDOR PARA QUE PUEDA PRESERVAR LA PROPIEDAD COMERCIAL. SE INSTRUYE A LAS PARTES REUNIRSE Y CONSIDERAR ALTERNATIVAS. INFÓRMESE DE ELLO EN 20 DÍAS.

En la misma fecha el foro de primera instancia emitió *Orden*, mediante la cual resolvió:

> ENTERADO, NO PROCEDE PARALIZACIÓN. EN VISTA DE QUE SE HA INSTRUIDO A LAS PARTES REUNIRSE E INFORMAR EN UN PLAZO DE 20 DÍAS (VÉASE OTRA ORDEN DE HOY), LA PARTE DEMANDADA TENDRÁ UN TÉRMINO FINAL DE 15 DÍAS PARA PRESENTAR SU ESCRITO DE CONFORMIDAD CON LA REGLA 36 DE PROC. CIVIL, A PARTIR DE LO QUE SE INFORME LUEGO DE REUNIRSE, SI ES QUE NO SE LLEGA A ALGÚN ACUERDO.

El 7 de agosto de 2025, la parte apelada presentó *Moción Informativa y en Cumplimiento de Orden (Ent #62)*. La parte apelada aseguró haber llevado a cabo una reunión por videoconferencia con la parte apelante, donde acordaron que esta última realizaría una oferta y presentaría una serie de documentos para sustentarla. Sin embargo, pese a varias comunicaciones cursadas por PRRD, la parte apelante no sometió una oferta concreta, por lo cual, no se logró llegar a un acuerdo.

En respuesta, el 9 de agosto de 2025, la parte apelante sometió *Solicitud de Paralización de los Procedimientos y Oposición a Sentencia Sumaria*. Nuevamente adujo que se estaría acogiendo a la reglamentación federal de la CFPB, sec. 1024.41(f). Asimismo, volvió a solicitar que se le ordenara a la parte apelada hacer entrega del pagaré hipotecario. De igual forma, se opuso de manera general a que se dictara sentencia sumaria a favor de la parte apelada, por

entender que existe una controversia real y material. Le solicitó al foro apelado paralizar los procedimientos.

El Tribunal de Primera Instancia le concedió a la parte apelada un término de diez días para expresarse en cuanto al examen del pagaré y la paralización solicitada.

Subsiguientemente, la parte apelada presentó *Moción en Cumplimiento con Orden (Ent. #71) y con Relación a "Solicitud de Paralización de los Procedimientos y Oposición a Sentencia Sumaria" (Ent #70) y "Solicitud de Orden y/o Resolución" (Ent #72 y Ent #74)*. En primer lugar, mencionó que, no tenía inconveniente en realizar una reunión para que la parte apelante pudiera examinar el original del pagaré hipotecario. En cuanto a la solicitud de paralización, la parte apelada adujo que esta no procedía. Señaló que, ya dicha solicitud fue adjudicada y declarada No Ha Lugar mediante *Orden* emitida por el foro *a quo*. Conforme lo anterior acotó que, aplicaba la doctrina de la Ley del Caso. Reseñó que, la segunda solicitud de paralización era una copia de la primera solicitud de paralización que había sido previamente resuelta. De acuerdo a la parte apelante, no procedía la aplicación del proceso de *loss mitigation* debido a que la propiedad en cuestión es una de carácter comercial que no constituía la residencia principal de la parte apelante. Asimismo, añadió que, la Ley Núm. 184-2012, tenía como propósito establecer un procedimiento de mediación compulsoria entre el acreedor y el deudor hipotecario en todos los procesos de ejecución de hipoteca sobre las propiedades que sean la vivienda principal del deudor. En este caso, por no ser la vivienda principal de la parte apelante, no aplicaba el mencionado estatuto. Por motivo de lo anterior, la parte apelada solicitó al foro primario declarar No Ha Lugar la solicitud de paralización y que adjudicara la solicitud de sentencia sumaria.

El 27 de agosto de 2025, la primera instancia judicial emitió *Orden* en la cual dispuso:

A LA SOLICITUD DE PARALIZACIÓN DE LA PARTE DEMANDADA, NO HA LUGAR. QUEDA SOMETIDA LA MOCIÓN DE SENTENCIA SUMARIA PARA EVALUACIÓN Y DISPOSICIÓN CONFORME A DERECHO.

Finalmente, resueltos varios asuntos procesales, el 3 de noviembre de 2025, el Tribunal de Primera Instancia emitió la *Sentencia* cuya revisión nos atiene. Mediante dicho dictamen, el foro *a quo* realizó las siguientes determinaciones de hechos:

### A. Préstamo hipotecario

1. El 1 de noviembre de 2007, el BDE como acreedor, Zymbia como deudora, y Díaz Chico como garantizadora solidaria, suscribieron una Carta de Compromiso.

2. El 31 de diciembre de 2007, el BDE como acreedor, Zymbia como deudora y Díaz Chico como garantizadora solidaria, otorgaron un Contrato de Préstamo, autenticado ante la notario público Yasmín M. Santiago Zayas bajo el afidávit número 4,580, mediante el cual se concedió a Zymbia un préstamo comercial por la suma agregada de $273,740.00 dividido en las siguientes dos (2) facilidades de crédito: (a) un préstamo a término por la suma principal de $223,740.00 (en lo sucesivo, el "Préstamo I"), y (b) un préstamo a término por la suma principal de $50,000.00 (en lo sucesivo, el "Préstamo II").

3. La Sección 3.06 del Contrato de Préstamo dispone específicamente que:

   Sección 3.06. Cesión de Colateral. El Banco tendrá el derecho absoluto de vender o ceder a cualquier otro Banco, fideicomiso o institución, toda o cualquier parte del Préstamo. Además, el Banco podrá constituir, a su opción, cualquier gravamen sobre cualquier colateral que garantice el pago del Préstamo para fines de levantar fondos para cumplir, si necesario, con las términos y condiciones de este Contrato.

4. El Préstamo I está evidenciado por un Pagaré emitido el 21 de diciembre de 2007 del cual surge Zymbia como deudora y Díaz Chico como garantizadora solidaria, a favor del BDE, o a su orden, debidamente endosado a favor de PR Recovery, por la suma principal de $223,740.00, acumulando intereses a una tasa variable del 1% sobre la tasa de interés anual determinada por el Citibank, N.A., con una tasa anual mínima a cobrar del 5.5%, con un vencimiento al 5 de enero de 2038, autenticado bajo el afidávit número 4,581 de la notario

público Yasmín M. Santiago Zayas (en adelante el "Pagaré Operacional I").

5.  El Préstamo II está evidenciado por un Pagaré emitido el 21 de diciembre de 2007 por Zymbia como deudora y Díaz Chico como garantizadora solidaria a favor del BDE, o a su orden, debidamente endosado a favor de PR Recovery, por la suma principal de $50,000.00, acumulando intereses a una tasa variable del 0.5% sobre la tasa de interés anual determinada por el Citibank, N.A., con una tasa anual mínima a cobrar del 4%, con un vencimiento el 5 de enero de 2018, autenticado bajo el afidávit número 4,582 de la Notario Público Yasmín M. Santiago Zayas (en adelante el "Pagaré Operacional II").

6.  PR Recovery es el tenedor físico de los Pagarés Operacionales I y II, los cuales están debidamente endosados a favor de PR Recovery.

## B. La Colateral Hipoteca

7.  Como colateral para asegurar el pago y cumplimiento puntual de sus obligaciones bajo el Contrato de Préstamo y toda obligación presente y futura de Zymbia para con el BDE, Zymbia entregó al BDE, en carácter prendario, el siguiente pagaré hipotecario, el cual está en posesión de PR Recovery en virtud de un Contrato de Prenda, autenticado mediante el afidávit número 4,585 de la notario público Yasmín M. Santiago Zayas el 21 de diciembre de 2007 (en adelante, el "Contrato de Prenda"):

    a. Pagaré hipotecario emitido el 21 de diciembre de 2007, por Zymbia a favor del BDE, o a su orden, debidamente endosado a favor de PR Recovery, por la suma principal de $229,000.00, autenticado bajo el afidávit número 4,584 de la Notario Público Yasmín M. Santiago Zayas (en lo sucesivo, el "Pagaré Hipotecario").

    b. El Pagaré Hipotecario está garantizado por hipoteca constituida mediante la Escritura Número 42 de Hipoteca en Garantía de Pagaré, otorgada en San Juan, Puerto Rico, el 21 de diciembre de 2007, ante la Notario Público Yasmín M. Santiago Zayas, la cual consta inscrita al folio 1965 del tomo 1129 de Sabana Llana, finca número 10,343, Registro de la Propiedad, Sección V de San Juan (en lo sucesivo, la "Hipoteca").

8.  La Hipoteca que garantiza el Pagaré Hipotecario grava la siguiente propiedad, cuyo titular registral es Zymbia:

URBANA: Solar marcado con el número tres (3) del bloque KG (hoy Calle Molucas 841) del Plano de Inscripción de la Cuarta Extensión, primera etapa de la Urbanización Country Club, situada en el Barrio Sabana Llana del municipio de Río Piedras, San Juan, Puerto Rico, con una cabida superficial de trescientos cincuenta (350.00) metros cuadrados, colindando por el NORESTE, en veinticinco (25.00) metros con el solar número cuatro (4); por el SUROESTE, en veinticinco (25.00) metros con el solar número dos (2); por el SURESTE, en catorce (14.00) metros con el solar número veinticuatro (24); y por el NOROESTE, en catorce (14.00) metros, con la Avenida Iturregui.

Consta inscrita al folio ciento noventa y ocho (198) del tomo quinientos dieciocho (518) de Sabana Llana, finca número diez mil trescientos cuarenta y tres (10,343) del Registro de la Propiedad de Puerto Rico, Sección Quinta de San Juan.

## C. Colateral Adicional

9. Como colateral para asegurar el pago y cumplimiento puntual de sus obligaciones bajo el Contrato de Préstamo, el 21 de diciembre de 2007, el BDE y Zymbia suscribieron un Acuerdo de Gravamen Mobiliario ante la notario público Yasmín M. Santiago Zayas bajo el afidávit número 4,587 (en adelante, el "Gravamen Mobiliario"), mediante el cual, entre otras cosas, Zymbia transfirió, cedió, otorgó y/o pignoró a favor de BDE todo derecho, título y/o interés sobre todo el equipo y maquinaria, inventario y las cuentas por cobrar, presentes o futuras, y el producto de cualesquiera de ellos, incluyendo y sin limitarse al equipo a ser adquirido por Zymbia.

10. El Gravamen Mobiliario quedó debidamente perfeccionado mediante la radicación de la declaración de financiamiento número 2008005348 en el Departamento de Estado de Puerto Rico (en adelante, la "Declaración de Financiamiento"), autenticada el 21 de diciembre de 2007 bajo el afidávit número 4,588 de la Notario Público Yasmín M. Santiago Zayas.

11. La Declaración de Financiamiento fue enmendada el 18 de enero de 2019 (en adelante, la "Enmienda I a la Declaración de Financiamiento").

12. La Declaración de Financiamiento I fue enmendada el 23 de enero de 2023 (en adelante, la "Enmienda II a la Declaración de Financiamiento").

### D. La Garantía Continua e Ilimitada

13. El 21 de diciembre de 2007, Díaz Chico otorgó una Garantía Continua e Ilimitada autenticada bajo el afidávit número 4,583 de la Notario Público Yasmín M. Santiago Zayas mediante la cual garantizó solidariamente el pago de todas las obligaciones presentes y futuras de Zymbia.

### E. Sumas de dinero adeudadas

14. Zymbia, como deudora y garantizada solidariamente por Díaz Chico, ha incumplido con sus obligaciones de pago bajo el Contrato de Préstamo, los Pagarés Operacionales I y II, el Contrato de Prenda, el Pagaré Hipotecario, el Gravamen Mobiliario, la Garantía y los demás documentos de préstamo antes mencionados.

15. Para la fecha de 26 de septiembre de 2024, la parte demandada le adeuda a PR Recovery bajo el Contrato de Préstamo y los demás documentos de préstamos, una suma no menor de $297,638.43 la cual se desglosa como sigue: (i) $187,378.83 por concepto de principal más (ii) $87,359.60 por concepto de intereses acumulados y no apagados, cantidad que se continúa acumulando hasta su total y completo pago a razón de $28.24 diarios; más (iii) $22,900.00 por concepto de costas, gastos y honorarios de abogado pactados expresamente por las partes, según se desprende del Pagaré Hipotecario y la Hipoteca.

16. Al presente, las obligaciones de pago de la parte demandada se encuentran vencidas, son líquidas e inmediate exigibles.

17. Las gestiones de cobro por parte de PR Recovery han resultado infructuosas.

18. A pesar de ello y de los requerimientos de pago de PR Recovery, al presente, la parte demandada, en incumplimiento con las obligaciones asumidas bajo el Contrato de Préstamo, los Pagarés Operacionales I y II y los demás documentos de préstamo, no ha pagado dicha deuda en su totalidad.

Subsiguientemente, evaluados y aquilatados el derecho aplicable y la prueba sometida por las partes, el foro primario concluyó lo siguiente:

Por los fundamentos antes expuestos, se declara HA LUGAR la *Demanda* y la *Moción de sentencia sumaria* (Sumac # 44) que presentó PR Recovery, y NO HA LUGAR la *Solicitud de paralización de los procedimientos y oposición a sentencia sumaria* (Sumac # 70) que presentó la parte demandada. Por

consiguiente, se ordena [a] la parte demandada a que, de forma solidaria, pague a PR Recovery las siguientes partidas mencionadas en la *Moción de sentencia sumaria* (Sumac # 44):

- $187,378.83 por concepto de principal;

- $87,359.60 por concepto de intereses acumulados y no pagados, los cuales continuarán acumulando hasta su pago total a razón de $28.24 diarios;

- Más $22,900.00 por concepto de costas, gastos y honorarios de abogado.

De no pagar el balance adeudado y advenida final y firme la presente *Sentencia*, se ordena a Secretaría expedir Mandamiento al Alguacil para que proceda a la venta en pública subasta, al mejor postor, del bien hipotecado descrito en la *Demanda*, sin perjuicio del derecho de PR Recovery de continuar con los procedimientos ordinarios hasta el cobro total de las cantidades reclamadas en la *Demanda* de autos.

El tipo mínimo fijado en este caso para una primera subasta será el que surge de los pagarés ejecutados. De declararse desierta y tener que celebrarse una segunda subasta, el precio mínimo para esta serán dos terceras partes (2/3) del precio mínimo de la primera subasta; y en caso de haber una tercera subasta, el tipo mínimo para esta será la mitad (1/2) del precio mínimo pautado para la primera subasta. Esto, sin perjuicio del derecho de PR Recovery de continuar con los procedimientos ordinarios hasta el cobro total de las cantidades reclamadas en la *Demanda* de autos.

Una vez celebrada la subasta y adjudicada la propiedad al mejor postor, el Alguacil otorgará la correspondiente posesión material de dicha propiedad, teniendo a tal fin la *Sentencia* el efecto de auto posesorio, y en los casos que fuere necesario, procediendo al lanzamiento de los ocupantes de la propiedad subastada.

Del producto de la venta judicial, se procederá a satisfacer a PR Recovery la totalidad de la *Sentencia*, incluyendo sin limitación, la suma pactada para costas y honorarios de abogado, y si hubiere algún remanente y no hubiere gravámenes posteriores, se dispone que el mismo le corresponde a la Parte Demandada, el cual le sería entregado mediante posterior orden del Tribunal. En caso de que el producto de la venta no fuere suficiente para satisfacer la totalidad de la *Sentencia* dictada y los gastos de la venta judicial, se Ordena que se expida *Orden y Mandamiento de Embargos de Ejecución*, proveyendo para la venta y ejecución de cualesquiera otros bienes muebles o inmuebles de la Parte Demandada, hasta dejar pagada cualquier deficiencia o parte insoluta de la *Sentencia*.

Una vez vendida y adjudicada la propiedad inmueble en la subasta y previo los trámites de Ley correspondientes, se Ordena la cancelación de los pagarés objeto de esta *Demanda* y que el Registrador correspondiente proceda a la cancelación de gravámenes posteriores a la hipoteca en cuestión, que surjan en el Registro de la Propiedad.

Inconforme con este proceder, la parte apelante presentó *Moción Solicitando Reconsideración de Sentencia*, el 20 de noviembre de 2025.

Mientras que, el 17 de diciembre de 2025, la parte apelada presentó una *Oposición a "Moción Solicitando Reconsideración de Sentencia (87)"*.

El foro primario, el 13 de marzo de 2026, dictó la siguiente *Resolución*:

> ATENDIDA LA *MOCIÓN DE RECONSIDERACIÓN DE SENTENCIA* PRESENTADA POR LA PARTE DEMANDADA Y LA *OPOSICIÓN* A ESTA DE LA PARTE DEMANDANTE, SE DECLARA **NO HA LUGAR** LA PRIMERA.
>
> HABIENDO LA DEMANDADA INSPECCIONADO EL PAGARÉ, EL TRIBUNAL REITERA SU DETERMINACIÓN MEDIANTE LA SENTENCIA EMITIDA EN EL CASO (ENTRADA #87 EN SUMAC).

Aún en desacuerdo, la parte apelante acudió ante este foro revisor y esgrimió los siguientes señalamientos de error:

> ERRÓ EL TPI AL RESOLVER LA SENTENCIA SUMARIA A FAVOR DE LA PARTE RECURRIDA CUANDO EXISTE CONTROVERSIA SOBRE SI LA DEUDA ES UNA V[Á]LIDA, L[Í]QUIDA Y EXIGIBLE.

Luego de dictarle término para comparecer, el 15 de mayo de 2026, la parte apelada sometió su *Oposición a Apelación*.

Con el beneficio de la comparecencia de las partes, procedemos a resolver.

## II

### A. Sentencia Sumaria

La sentencia sumaria es un mecanismo procesal disponible en nuestro ordenamiento que nos permite resolver controversias sin

que se requiera llegar a la etapa de juicio.[2] *Segarra Rivera v. Int'l Shipping et al.*, 208 DPR 964 (2022); *Serrano Picón v. Multinational Life Ins.*, 212 DPR 981 (2023); *González Meléndez v. Mun. San Juan et al.*, 212 DPR 601 (2023); *Birriel Colón v. Econo y Otros*, 213 DPR 80, 90 (2023); *BPPR v. Cable Media*, 2025 TSPR 1, 215 DPR ___ (2025). La sentencia sumaria está regida por la Regla 36 de Procedimiento Civil de 2009, 32 LPRA Ap. V, R. 36, la cual desglosa los requisitos específicos con los que debe cumplir esta norma procesal. *Lugo Montalvo v. Sol Meliá Vacation*, 194 DPR 209, 224 (2015); *Negrón Castro et al. v. SLG et al.*, 2025 TSPR 96, 216 DPR ___ (2025).

Ante la ausencia de una controversia sustancial y real sobre hechos materiales, sólo resta aplicar el derecho pertinente a la controversia. *Serrano Picón v. Multinational Life Ins.*, supra, pág. 992; *Batista v. Sucn. Batista et al.*, 2025 TSPR 93, 216 DPR ___ (2025); *Conklin v. Passalacqua*, 2026 TSPR 18 (2026). Cuando se habla de hechos materiales, nos referimos a aquellos que pueden determinar el resultado de la reclamación, de conformidad con el derecho sustantivo aplicable. Así pues, el propósito de la sentencia sumaria es facilitar la pronta, justa y económica solución de los casos que no presenten controversias genuinas de hechos materiales.[3] *Alicea Pérez v. Coop. Seg. Múlt. et al.*, 210 DPR 71 (2022); *Negrón Castro et al. v. SLG et al.,* supra; *BPPR v. Cable Media*, supra; *Conklin v. Passalacqua*, supra. Procede dictar sentencia sumaria si de las alegaciones, deposiciones y admisiones ofrecidas, en unión a las declaraciones juradas y alguna otra evidencia admisible, se acredita la inexistencia de una controversia real y

---

[2] *Ramos Pérez v. Univisión,* 178 DPR 200, 213 (2010); *SLG Fernández-Bernal v. RAD-MAN et al.*, 208 DPR 310 (2021); *Rosado Reyes v. Global Healthcare,* 205 DPR 796, 808 (2020); *Delgado Adorno v. Foot Locker Retail,* 208 DPR 622 (2022).
[3] *Velázquez Ortiz v. Mun. de Humacao,* 197 DPR 656, 662-663 (2017); *SLG Fernández-Bernal v. RAD-MAN*, supra, pág. 13; *Roldán Flores v. M. Cuebas, Inc.*, 199 DPR 664, 676 (2018).

sustancial respecto a algún hecho esencial y material y, además, si procede en derecho. *SLG Fernández-Bernal v. RAD-MAN*, supra, pág. 13; *Batista v. Sucn. Batista et al.*, supra. De la prueba adjunta a la solicitud de sentencia sumaria, deberá surgir preponderadamente la inexistencia de controversia sobre los hechos medulares del caso. *Birriel Colón v. Econo y Otros*, supra, pág. 91.

Cónsono con esto, en el pasado el Tribunal Supremo de Puerto Rico ha afirmado que -utilizado ponderadamente- el mecanismo de sentencia sumaria es un vehículo idóneo para descongestionar los calendarios de los tribunales y evitar el derroche de dinero y tiempo que implica la celebración de un juicio en su fondo. Véase *Carpets & Rugs v. Tropical Reps.*, 175 DPR 615 (2009); *Padín v. Rossi*, 100 DPR 259 (1971); *Pérez Vargas v. Office Depot*, 203 DPR 687 (2019).

La Regla 36.3 de Procedimiento Civil, 32 LPRA Ap. V, detalla el procedimiento que deben seguir las partes al momento de solicitar que se dicte una sentencia sumaria a su favor. A esos efectos, establece que una solicitud al amparo de ésta deberá incluir: (1) una exposición breve de las alegaciones de las partes; (2) los asuntos litigiosos o en controversia; (3) la causa de acción, reclamación o parte respecto a la cual es solicitada la sentencia sumaria; (4) una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal; (5) las razones por las cuales debe ser dictada la sentencia, argumentando el derecho aplicable, y (6) el remedio que debe ser concedido. 32 LPRA Ap. V. R. 36.3. *Rodríguez García v. UCA,* 200 DPR 929, 940 (2018); *SLG Fernández-Bernal v. RAD-MAN*, supra, pág. 14.

Cumplidos estos requisitos, el Tribunal Supremo de Puerto Rico expresó además en *Pérez Vargas v. Office Depot,* supra, pág. 699, que el inciso (e) de la Regla 36.3 establece lo siguiente:

> La sentencia solicitada será dictada inmediatamente si las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente y que, como cuestión de derecho, el tribunal debe dictar sentencia sumaria a favor de la parte promovente. El tribunal podrá dictar sentencia sumaria de naturaleza interlocutoria para resolver cualquier controversia entre cualesquiera partes que sea separable de las controversias restantes. Dicha sentencia podrá dictarse a favor o contra cualquier parte en el pleito. Si la parte contraria no presenta la contestación a la sentencia sumaria en el término provisto en esta regla, se entenderá que la moción de sentencia sumaria queda sometida para la consideración del tribunal. 32 LPRA Ap. V, R. 36.3 (e).

La sentencia sumaria no procederá en las instancias que: 1) existan hechos materiales y esenciales controvertidos; 2) haya alegaciones afirmativas en la demanda que no han sido refutadas; 3) surja de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material y esencial; o 4) como cuestión de derecho, no proceda. *SLG Fernández-Bernal v. RAD-MAN,* supra, pág. 14; *Serrano Picón v. Multinational Life Ins.,* supra, pág. 992; *Conklin v. Passalacqua,* supra; *Negrón Castro et al. v. SLG et al.,* supra.

En armonía con la normativa reseñada, nuestra Máxima Curia ha expresado que, el oponente debe controvertir la prueba presentada con evidencia sustancial y no puede simplemente descansar en sus alegaciones *Birriel Colón v. Econo y Otros,* supra, pág. 90; *BPPR v. Cable Media,* supra; *Ramos Pérez v. Univisión,* supra, págs. 215-216.   Las meras afirmaciones no bastan. *Íd.* "Como regla general, para derrotar una solicitud de sentencia sumaria la parte opositora debe presentar contradeclaraciones juradas y contradocumentos que pongan en controversia los hechos

presentados por el promovente". *Ramos Pérez v. Univisión*, supra, pág. 215. (Cita omitida). *Roldán Flores v. M. Cuebas, Inc.*, supra, pág. 677. Además, se le exige a la parte que se oponga ciertas exigencias adicionales. Primeramente, deberá presentar una relación concisa y organizada de los hechos esenciales y pertinentes que, a su juicio, estén en controversia, citando específicamente los párrafos según fueron enumerados por el promovente de la moción. *SLG Fernández-Bernal v. RAD-MAN*, supra, pág. 15. También, deberá enumerar los hechos que no estén en controversia, con indicación de los párrafos o páginas de las declaraciones juradas u otra prueba admisible donde se establezcan estos. *Íd.* En adición, deberá esbozar las razones por las cuales no se debe dictar sentencia sumaria, argumentando el derecho aplicable. *Íd.*

Si el oponente no controvierte los hechos propuestos de la forma en la que lo exige la Regla 36.3 de Procedimiento Civil, *supra*, se podrán considerar como admitidos y se dictará la Sentencia Sumaria en su contra, si procede. *Roldán Flores v. M. Cuebas, Inc.*, supra, pág. 677.

Respecto a la revisión de las sentencias sumarias, el foro apelativo deberá utilizar los mismos criterios que el Tribunal de Primera Instancia. *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 114 (2015); *González Meléndez v. Mun. San Juan*, supra. Nuestro Máximo Foro ha sido claro en que, [l]os tribunales apelativos estamos limitados a: (1) considerar los documentos que se presentaron ante el foro de primera instancia; (2) determinar si existe o no alguna controversia genuina de hechos materiales y esenciales, y (3) comprobar si el derecho se aplicó de forma correcta. *Birriel Colón v. Econo y Otros*, supra, pág. 91; *Batista v. Sucn. Batista et al.*, supra. De acuerdo a lo anterior, el foro apelativo está obligado a examinar *de novo* la totalidad de los documentos incluidos en el expediente de la forma más favorable al promovido. *Íd.*; *Birriel Colón*

*v. Econo y Otros*, supra, págs. 91-92; *Negrón Castro et al. v. SLG et al.*, supra; *Serrano Picón v. Multinational Life Ins.*, supra, pág. 993; *Meléndez González et al. v. M. Cuebas*, supra, pág. 116.

**B. Contratos**

Es normativa reiterada que, las obligaciones nacen de la ley, de los contratos y cuasicontratos, de los actos ilícitos, u omisiones en que interviene culpa o negligencia, y cualquier otro acto idóneo para producirlas.[4] Art. 1042 del Código Civil, 31 LPRA ant. sec. 2992; *Universal Ins. v. Popular Auto*, 207 DPR 228, 238 (2021); *NHIC et al. v. García Passalacqua et al.*, 206 DPR 105 (2021). Los contratos son negocios jurídicos bilaterales y en nuestro ordenamiento, constituyen una de las varias formas en que las personas pueden obligarse entre sí. *Amador v. Conc. Igl. Univ. de Jesucristo*, 150 DPR 571, 581 (2000). Los contratos se perfeccionan cuando median el objeto, consentimiento y causa. Art. 1213 del Código Civil, 31 LPRA ant. sec. 3391; *Pérez Rodríguez v. López Rodríguez et at.*, 210 DPR 163, 186 (2022). El contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa o prestar algún servicio. Art. 1206 del Código Civil, 31 LPRA ant. sec. 3371; *Pérez Rodríguez v. López Rodríguez et at.*, supra, pág. 186; *Aponte Valentín et al. v. Pfizer Pharm*, 208 DPR 263 (2021). En nuestro ordenamiento jurídico se ha reconocido el principio de libertad de contratación, el cual permite a las partes pactar los términos y condiciones que tengan por convenientes. *Pérez Rodríguez v. López Rodríguez et at.*, supra, pág. 187; *Burgos López et al. v. Condado Plaza*, 193 DPR 1, 7-8 (2015); *Arthur Young & Co. v. Vega III*, 136 DPR 157 (1994). No obstante, tal libertad no es infinita, puesto que, encuentra su límite

---

[4] El derecho aplicable en el caso de epígrafe se remite al Código Civil de Puerto Rico de 1930, puesto que, la presentación de la *Demanda* y los hechos que dan base a esta tuvieron lugar antes de la aprobación del nuevo Código Civil de Puerto Rico, Ley 55-2020, según enmendado.

en el Art. 1207 del Código Civil, 31 LPRA ant. sec. 3372. El referido artículo dispone que, los términos y condiciones que las partes establezcan serán válidas cuando no sean contrarias a la ley, la moral, ni al orden público. *Íd.*; *Burgos López et al. v. Condado Plaza*, supra, págs. 7-8; *Oriental Bank v. Perapi*, 192 DPR 7, 15 (2014). Una vez perfeccionado el contrato, lo acordado tiene fuerza de ley entre las partes, "y desde entonces obligan, no solo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conforme a la buena fe, al uso y a la ley". Art. 1210 del Código Civil, 31 LPRA ant. sec. 3375; *Aponte Valentín v. Pfizer Pharms.*, supra; *Burgos López et al. v. Condado Plaza*, supra, pág. 8. Los tribunales estamos facultados para velar por el cumplimiento de los contratos, y no debemos relevar a una parte del cumplimiento de su obligación contractual cuando tal contrato sea legal, válido y no contenga vicio alguno. *Mercado, Quilichini v. UCPR*, 143 DPR 627 (1997).

### C. La Hipoteca

La hipoteca es una garantía de naturaleza real, que se caracteriza por su accesoriedad y por su función aseguradora de una deuda en dinero. *Vázquez Santiago v. Registrador*, 137 DPR 384, 388 (1994). Se trata de un contrato efectuado en garantía del cumplimiento de una obligación principal; sin ésta ningún contrato de hipoteca pudiera subsistir al carecer de objeto -que es la garantía principal cuyo cumplimiento asegura-. *Liechty v. Descartes Sauri*, 109 DPR 496, 500-502 (1980).

Pese a su particular carácter constitutivo y accesorio, y los requisitos antes mencionados, la hipoteca, "requiere para su validez que concurran los elementos esenciales de **consentimiento**, objeto y causa". *Romero v. S.L.G. Reyes*, 164 DPR 721, 736 (2005).

### D. Ley de Transacciones Comerciales (LTC)

La Ley Núm. 208-1995, conocida como la Ley de Transacciones Comerciales, según enmendada, 19 LPRA sec. 401 *et seq.*, se adoptó con la finalidad de simplificar, clarificar y modernizar el derecho que rige las transacciones comerciales, uniformar el derecho entre las diversas jurisdicciones existentes y permitir la continua expansión de las prácticas comerciales.[5] Así, Puerto Rico se adaptó a la celeridad del tráfico moderno y a las tendencias del Siglo XXI en aspectos de transacciones bancarias y comerciales.[6]

Dicha Ley, en su Capítulo 2, recoge todo lo relacionado a la cesión de instrumentos negociables.[7] La Sec. 2-102 de la LTC define un instrumento negociable, como:

> (a) [. . .] una promesa incondicional de pagar una suma de dinero, pagaderos a la presentación o en fecha determinada, que no contiene ninguna otra promesa u orden, si el mismo:
>
> (1) Es pagadero al portador o a la orden al momento de su emisión o cuando primero adviene a la posesión de un tenedor;
>
> (2) es pagadero a la presentación o en una fecha específica, y
>
> (3) no especifica otro compromiso o instrucción por parte de la persona que promete u ordena el pago que no sea el pago del dinero, pero la promesa u orden puede contener: [. . .]
> 19 LPRA sec. 504(a).

Por su parte, nuestro Máximo Foro ha indicado que [l]os instrumentos negociables son documentos de crédito que incorporan el derecho a cobrar una suma de dinero, a los cuales el derecho cambiario les confiere una facilidad de circulación especial.[8]

---

[5] Sec. 1-102 de la LTC, 19 LPRA sec. 401. *Cruz Consulting v. El Legado, et al.,* 191 DPR 499, 508 (2014); *COSSEC v. González López,* 179 DPR 793, 802 (2010).

[6] Véase, Exposición de la Ley de Transacciones Comerciales, Ley Núm. 208-1995, *supra,* 1995 (Parte I) Leyes de Puerto Rico 1012. *DLJ Mortgage Capital, Inc. v. Santiago Martínez,* supra.

[7] Véase, Sec. 2-203 de la LTC, 19 LPRA sec. 553. *DLJ Mortgage Capital, Inc. v. Santiago Martínez,* supra.

[8] *Cruz Consulting v. El Legado et al.,* 191 DPR 499, 509-510 (2014), citando a MR Garay Aubán, *Derecho cambiario de Estados Unidos y Puerto Rico*, Ponce, Ed. Rev. Der. Pur., 1999, pág. 1.

Se caracterizan por su idoneidad para el tráfico comercial. Desde el origen de la letra de cambio hasta el pagaré moderno, el valor de los instrumentos negociables yace en su liquidez, que se debe a que el comprador de un instrumento negociable solamente necesita verificar el contenido del instrumento mismo para cerciorar la autoridad del vendedor para transferirlo sin tener que preocuparse por restricciones u obligaciones exógenas. Consecuentemente, de ordinario un comprador de un instrumento negociable no enfrentaría problema alguno si quisiera intercambiarlo por dinero en efectivo.[9] En vista de lo anterior, la negociabilidad es la característica medular de los instrumentos negociables y la fuente de su importancia para nuestras relaciones económicas.[10]

Por otra parte, [u]n pagaré hipotecario es una promesa, es decir, "un compromiso escrito de dinero suscrito por la persona que se obliga a pagar".[11] Ahora bien, el simple reconocimiento de la obligación no constituye un pagaré a menos que el deudor se comprometa a pagar la misma.[12]

Sobre lo que constituye una cesión de un instrumento negociable, el mencionado Capítulo 2 de la Ley de Transacciones Comerciales, *supra*, establece que ésta ocurre "cuando se entrega por una persona que no sea su emisor con el propósito de darle a la persona que lo recibe el derecho a exigir el cumplimiento del instrumento".[13] "Sea esta una negociación o no, confiere al cesionario cualquier derecho del cedente a exigir el cumplimiento del instrumento, incluyendo cualquier derecho que tuviese como tenedor de buena fe …".[14]

---

[9] E. Renuart, *Uneasy Intersections: The Right to Foreclose and the U.C.C.*, 48 Wake Forest L. Rev. 1205, 1215 (2013).
[10] *Des. Caribe v. Ven-Lour Enterprises*, 198 DPR 290, 297-298 (2017).
[11] Sec. 2-103(a)(9) de la LTC, 19 LPRA sec. 503(a)(9).
[12] *Íd. DLJ Mortgage Capital, Inc. v. David Santiago Martínez, et al.*, supra.
[13] Sec. 2-203 de la LTC, *supra*.
[14] *Íd. DLJ Mortgage Capital, Inc. v. David Santiago Martínez, et al.*, supra.

De igual forma, la sección 2-301 de la Ley de Transacciones Comerciales, *supra,* dispone quien tiene el derecho a exigir el cumplimiento del instrumento, a saber:

> "*Persona con derecho a exigir el cumplimiento de un instrumento*" significa (i) el tenedor del instrumento, (ii) una persona que no es tenedor pero está en posesión del instrumento y tiene los derechos de un tenedor, o (iii) una persona que no está en posesión del instrumento pero tiene derecho de exigir el cumplimiento del instrumento de acuerdo con las disposiciones de la Sección 2-309 y de la Sección 2-418(d). Una persona puede ser una persona con derecho a exigir el cumplimiento del instrumento aunque la persona no sea el dueño del instrumento o lo posea indebidamente. 19 LPRA sec. 601.

El *tenedor* es definido como aquella persona en posesión del instrumento negociable si el mismo es pagadero al portador, o en el caso de un instrumento pagadero a una persona identificada, si esta se encuentra en posesión del mismo. El *tenedor,* en cuanto a un documento de título, se refiere a la persona en posesión si los bienes son entregables al portador o a la orden de la persona en posesión.[15]

Por otro lado, la Sección 2-302 de la *Ley de Transacciones Comerciales* dispone sobre el *tenedor de buena fe*:

> (a)   Sujeto a las disposiciones de la subsección (c) y de la Sección 2-106(d), "tenedor de buena fe" significa el tenedor de un instrumento si:
>
> > (1)   cuando fue emitido o negociado al tenedor, el instrumento no tenía evidencia aparente de falsificación o alteración ni era de tal forma irregular o incompleto como para que debiera cuestionarse su autenticidad; y
> >
> > (2)   el tenedor tomó el instrumento (i) por valor, (ii) de buena fe, (iii) sin tener aviso de que el instrumento estuviese en mora o hubiese sido desatendido o de que existiese un incumplimiento no subsanado respecto al pago de otro instrumento emitido como parte de la misma serie, (iv) sin tener aviso de que el instrumento contiene una firma no autorizada o ha sido alterado, (v) sin tener aviso de la existencia de una reclamación contra el instrumento de las descritas en la Sección 2-306, y (vi) sin tener aviso de que una parte tenga una defensa o reclamación de resarcimiento de las descritas en la Sección 2-305(a).

---

[15] 19 LPRA sec. 451.

Esbozada la normativa jurídica que enmarca la controversia de epígrafe, procedemos a resolver.

**III**

En el ejercicio de nuestra función revisora nos corresponde: 1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra*, y la jurisprudencia le exigen al foro primario; 2) revisar que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36, *supra*; 3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos; 4) y de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar de *novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia[16].

De un ponderado análisis del expediente ante nuestra consideración, surge que, la parte apelada, en su moción de sentencia sumaria, cumplió sustancialmente con las formalidades dispuestas por la Regla 36 de Procedimiento Civil, *supra*. Puesto que, incluyó las alegaciones de las partes, realizó una enumeración de hechos sobre los cuales entendía eran incontrovertidos, de manera detallada, separada y sustentada. Asimismo, hizo referencia a varios documentos que obran en el expediente.

Ahora bien, la parte que desafía una solicitud de sentencia sumaria no puede descansar en las aseveraciones o negaciones consignadas en su alegación. Por el contrario, está obligada a enfrentar la moción de su adversario de forma tan detallada y específica como lo ha hecho el promovente en su solicitud, puesto

---

[16] *Roldán Flores v. M. Cuebas, Inc.*, supra, pág. 679.

que, de incumplir, corre el riesgo de que se dicte sentencia sumaria en su contra, de proceder en derecho.[17]

En el caso ante nos, la parte apelante, no se opuso a la moción de sentencia sumaria conforme exige las Reglas de Procedimiento Civil. La parte apelante presentó una moción intitulada *Solicitud de Paralización de los Procedimientos y Oposición a Sentencia Sumaria*. En la aludida moción se limitó a expresar que existía una controversia real y material de hechos, y que se oponía a que se dictara sentencia sumaria a favor de la parte apelada. La parte apelante no hizo referencia a la prueba documental que entendía que controvertían los hechos alegados por la parte contraria, ni indicó los párrafos con las páginas a las que hacía referencia. [18]

En cumplimiento con la normativa vigente sobre la sentencia sumaria, evaluamos de *novo* las determinaciones de hechos del Tribunal de Primera Instancia y las acogemos por no encontrarse en controversia.

Superada esta primera etapa, nos corresponde evaluar si el foro de primera instancia actuó correctamente al dictar sentencia sumaria a favor de la parte apelada.

En su único señalamiento de error, la parte apelante sostiene que, el foro de primera instancia incidió al resolver la solicitud de sentencia sumaria a favor de la parte apelada, cuando existe controversia sobre si la deuda es una válida, líquida y exigible.

Adelantamos que, no le asiste la razón. Veamos.

Según se desprende del expediente, el BDE como acreedor, Zymbia como deudora y la señora Díaz Chico como garantizadora solidaria, otorgaron un *Contrato de Préstamo*. Por medio de dicho contrato, fue concedido a Zymbia un préstamo comercial por la

---

[17] *Roldán Flores v. M. Cuebas*, supra, pág. 677; *Meléndez González et al. v. M. Cuebas*, supra, pág. 116.

[18] Regla 36.3(b) de Procedimiento Civil, *supra*; *SLG Fernández-Bernal v. RAD-MAN et al.*, supra, pág. 15.

suma agregada de $273,740.00, dividido en dos facilidades de crédito, a saber: a) un préstamo a término por la suma principal de $223,740.00, y b) un préstamo a término por la suma principal de $50,000.00. De acuerdo con las determinaciones de hechos aquí acogidas, la sección 3.06 del *Contrato de Préstamo* dispone lo siguiente:

> Sección 3.06. Cesión de Colateral. El Banco tendrá el derecho absoluto de vender o ceder a cualquier otro Banco, fideicomiso o institución, toda o cualquier parte del Préstamo. Además, el Banco podrá constituir, a su opción, cualquier gravamen sobre cualquier colateral que garantice el pago del Préstamo para fines de levantar fondos para cumplir, si necesario, con las términos y condiciones de este Contrato.

Las dos facilidades de crédito están evidenciadas mediante dos pagarés, en los cuales Zymbia figura como deudora y la señora Díaz Chico como garantizadora solidaria a favor del BDE, o a su orden, debidamente endosados a favor de PR Recovery. Cabe señalar que, PR Recovery es el tenedor físico de ambos pagarés.

Como colateral para asegurar el pago y el cumplimiento de las obligaciones al amparo del *Contrato de Préstamo* y toda obligación presente y futura de Zymbia para con el BDE, Zymbia entregó al BDE, en carácter prendario, un pagaré hipotecario que se encuentra en posesión de PR Recovery, en virtud de un contrato de prenda. Dicho pagaré está garantizado por una hipoteca constituida mediante Escritura Número 42 en Garantía de Pagaré. La hipoteca que garantiza el pagaré hipotecario grava una propiedad cuyo titular registral es Zymbia.

De igual forma, como colateral para asegurar el pago y cumplimiento puntual de sus obligaciones, conforme el *Contrato de Préstamo*, las partes suscribieron un Acuerdo de Gravamen Mobiliario ante notario. Por medio de este, Zymbia transfirió, cedió, otorgó y/o pignoró a favor de BDE todo derecho, título y/o interés

sobre todo el equipo y maquinaria, inventario y las cuentas por cobrar, presentes o futuras, y el producto de cualesquiera de ellos.

Asimismo, surge de la prueba presentada en el expediente que, la parte apelante ha incumplido con sus obligaciones de pago al amparo del *Contrato de Préstamo.*

La sección 2-301 de la la Ley de Transacciones Comerciales, *supra*, dispone que, la persona con derecho a exigir el cumplimiento de un instrumento es el tenedor del instrumento.[19] El *tenedor* es la persona en posesión del instrumento negociable si el mismo es pagadero al portador, o en el caso de un instrumento pagadero a una persona identificada, si esta se encuentra en posesión de este. El *tenedor,* en cuanto a un documento de título, se refiere a la persona en posesión si los bienes son entregables al portador o a la orden de la persona en posesión.[20]

Respecto al *tenedor de buena fe*, la Sección 2-302 de la Ley de Transacciones Comerciales, *supra*:

(a) Sujeto a las disposiciones de la subsección (c) y de la Sección 2-106(d), "tenedor de buena fe" significa el tenedor de un instrumento si:

(1) cuando fue emitido o negociado al tenedor, el instrumento no tenía evidencia aparente de falsificación o alteración ni era de tal forma irregular o incompleto como para que debiera cuestionarse su autenticidad; y

(2) el tenedor tomó el instrumento (i) por valor, (ii) de buena fe, (iii) sin tener aviso de que el instrumento estuviese en mora o hubiese sido desatendido o de que existiese un incumplimiento no subsanado respecto al pago de otro instrumento emitido como parte de la misma serie, (iv) sin tener aviso de que el instrumento contiene una firma no autorizada o ha sido alterado, (v) sin tener aviso de la existencia de una reclamación contra el instrumento de las descritas en la Sección 2-306, y (vi) sin tener aviso de que una parte tenga una defensa o reclamación de resarcimiento de las descritas en la Sección 2-305(a).

---

[19] 19 LPRA sec. 601.
[20] 19 LPRA sec. 451.

Según podemos observar, la parte apelada es el tenedor legítimo y de buena fe de los pagarés en cuestión, pues estos se encuentran endosados a su favor. Por tanto, ante el incumplimiento de la parte apelante con sus obligaciones conforme al *Contrato de Préstamo*, la deuda se convirtió en una vencida, líquida y exigible. Consecuentemente, la parte apelada se encuentra facultada para exigir el cumplimiento del instrumento.

Por los fundamentos que anteceden, el Tribunal de Primera Instancia *no* incidió en su proceder.

**IV**

Por los fundamentos expuestos, se *confirma* la Sentencia apelada.

Notifíquese.

Lo acordó y manda el Tribunal, y certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones